**MASSACHUSETTS EYE AND EAR INFIRMARY, Plaintiff,**

v.

**QLT, INC., Defendant.**

**No. CIV.A.00 10783 WGY.**

United States District Court, D. Massachusetts.

July 10, 2007.

Kenneth B. Herman, James F. Haley, Jr., Christopher J. Harnett, William H. Baker, David S. Chun, Brian P. Biddinger, Karen Mangasarian, Carla E. Sereny, Ropes & Gray, LLP, New York, NY, Christine M. Roach, Roach & Carpenter, P.C., Boston, MA, for Massachusetts Eye and Ear Infirmary, Plaintiff.

Donald R. Ware, Dean Richlin, Sarah E. Cooleybeck, Denise W. DeFranco, Barbara A. Fiacco, Gabriel M. Helmer, Miriam L. Pogach, Foley Hoag LLP, Boston, MA, for QLT Phototherapeutics, Inc., Defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

This lawsuit is the result of failed business negotiations for a royalty on the net sales of Visudyne, a blockbuster drug prescribed to treat age-related macular de-

generation. In the early to mid–1990s, researchers at Massachusetts Eye and Ear Infirmary ("MEEI") demonstrated that the drug had promise in treating age-related macular degeneration, a leading cause of blindness. QLT, Inc. ("QLT") owns the compositional patent to the drug. QLT promised MEEI that it would negotiate for the licensing rights to the medical procedure. After the parties were unable to reach agreement, this lawsuit followed.

Over QLT's objections, this case was tried to a jury on the claims of unjust enrichment and violation of Massachusetts General Laws, chapter 93A. The trial, which lasted three weeks, was ably handled by both parties. The jury displayed an extraordinary grasp of the complex facts surrounding the development of Visu-. dyne, asking questions that cut to the core. After two days of deliberation, the jury returned a verdict for MEEI. QLT then filed a motion for judgment notwithstanding the verdict, contending that, in federal court, the jury could only serve in an advisory capacity. To decide this central issue, this Court must wade through the murky waters of Seventh Amendment jurisprudence and a dense thicket of First Circuit precedent.

## II. PROCEDURAL POSTURE

MEEI filed the instant action on April 24, 2000. MEEI alleged breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, conversion, misrepresentation, unjust enrichment, misappropriation of trade secrets, and violation of chapter 93A. The district court granted summary judgment for QLT on all counts. On appeal, the First Circuit affirmed in part and reversed in part. The First Circuit held that MEEI could proceed on the theories of unjust enrichment, misappropriation of trade secrets, and violation of chapter 93A. *Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc. (MEEI I )*, 412 F.3d 215 (1st Cir.2005).

On remand, the case was assigned to this session of the Court. QLT twice moved for summary judgment on the trade secrets claim. This Court denied summary judgment, though it narrowed that claim to the alleged disclosure of MEEI's trade secrets by QLT on three specific dates. This Court empaneled a jury over QLT's objections that MEEI had no right to trial by jury on the unjust enrichment and chapter 93A claims. Trial commenced on October 16, 2006. After MEEI presented its case, QLT moved for a directed verdict. This Court granted the motion with respect to the trade secrets claim. QLT then presented its defense to the unjust enrichment and chapter 93A claims. On November 8, 2006, the jury returned a verdict for MEEI on the unjust enrichment and chapter 93A claims.

Subsequently, QLT filed a motion for judgment notwithstanding the verdict. QLT contended, among other things, that the jury could serve in no more than an advisory capacity. This Court heard the motion on December 20, 2006 and took the matter under advisement. The Court invited the parties to submit proposed findings of fact in the event that the Court ruled that the jury had served in an advisory capacity only. MEEI and QLT re-

quested until March 20, 2007 to submit the appropriate documents and then timely complied. Now, having fully considering the briefs and the record, this Court is prepared to rule.

## III. DISCUSSION

### A. The Right to Trial by Jury

■ In a diversity action, the right to a jury trial is matter of federal law. *Simler v. Conner*, 372 U.S. 221, 222, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963). When analyzing the right to a jury, the federal court "must look first to state law to determine the elements of the cause of action and the propriety of the remedies sought." *Gallagher v. Wilton Enters., Inc.*, 962 F.2d 120, 122 (1st Cir.1992). Once this is done, "the court should turn to federal law to 'characterize' the action and remedies as either legal or equitable." *Id.* The Supreme Court has delineated a two-part test to distinguish between legal and equitable rights:

> First, we compare the statutory action to the 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second inquiry is the more important in our analysis.

*Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990) (citations omitted).

Determining "which actions belong[ ] to law and which to equity for the purpose of delimiting the jury trial right continues to be one of the most perplexing questions of trial administration." Wright & Miller, 9 Federal Practice and Procedure: Civil 2d § 2302. This Court must here undertake that inquiry because MEEI contends that it has a right to trial by jury on both the unjust enrichment and chapter 93A claims.

### 1. Unjust Enrichment

■ The First Circuit has never squarely decided whether there is a right to a jury on a theory of unjust enrichment. Instead, different panels of that court merely assumed both that it was proper to try the unjust enrichment claim to a jury, *see, e.g., Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc.*, 470 F.3d 14 (1st Cir.2006), or to the bench, *see, e.g., Levin v. Dalva Bros., Inc.*, 459 F.3d 68 (1st Cir.2006). The only case squarely on point is a decision from the District of New Hampshire holding that there is no right to a jury on an unjust enrichment claim because New Hampshire courts traditionally have understood unjust enrichment as an equitable claim and restitution is an equitable form of monetary relief. *Almaz v. Temple–Inland Forest Prods. Corp.*, No. Civ. 97–374–JM, 2000 WL 36938 (D.N.H. Nov.22, 1999).

Despite the lack of controlling precedent, the First Circuit appears to have provided sufficiently definitive guidance to resolve this matter. As described, the First Circuit's holding in *Gallagher v. Wilton Enters., Inc.* directs the court to begin the inquiry by determining the elements of the state law claim in question. 962 F.2d at 122. Under Massachusetts law, unjust enrichment has the familiar requirement that one party be unjustly enriched and the other party suffer an unjust detriment. Massachusetts law has, however, an additional requirement for unjust enrichment. Massachusetts courts have repeatedly held that when there is an adequate remedy at law, there can be no unjust enrichment. In *Santagate v. Tower*, 64 Mass.App.Ct. 324, 833 N.E.2d 171 (2005), the Appeals Court stated that "[a]n equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law." *Id.* at 329, 833 N.E.2d 171; *see also, e.g.*,

*Fox v. F & J Gattozzi Corp.*, 41 Mass.App. Ct. 581, 589, 672 N.E.2d 547 (1996) (unjust enrichment claim duplicative when plaintiff had prevailed on breach of contract claim); *Popponesset Beach Ass'n, Inc. v. Marchillo,* 39 Mass.App.Ct. 586, 593, 658 N.E.2d 983 (1996) (declining to reach the unjust enrichment theory because plaintiff had suitable remedy at law). In the District of Massachusetts, Judge Tauro, Judge Stearns, as well as this session of the Court, have all invoked this principle in disposing of unjust enrichment claims. *See, e.g., In re Lupron Mktg. and Sales Practices Litig.,* 295 F.Supp.2d 148, 182 (D.Mass.2003) (Stearns, J.); *One Wheeler Road Assocs. v. Foxboro Co.,* 843 F.Supp. 792, 799 (D.Mass.1994); *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.,* 774 F.Supp. 683, 687 (D.Mass.1991) (Tauro, J.).

Although federal law, and not state law, determines whether a claim is legal or equitable in nature, Massachusetts' requirement that there be no available legal remedy expressly marks unjust enrichment as an equitable remedy. Consequently, there is no Seventh Amendment right to a jury solely on the basis of that claim.

### 2. Chapter 93A

■ Under chapter 93A, "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Mass. Gen. Law ch. 93A, § 2(a). The First Circuit has explained that, in determining whether a practice violates chapter 93A, the factfinder must look to "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *MEEI I,* 412 F.3d at 243 (quoting

*PMP Assocs., Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 596, 321 N.E.2d 915 (1975)). The statute provides for actual damages and attorneys' fees. Mass. Gen. Laws ch. 93A, § 11. If the defendant willfully or knowingly violated chapter 93A, then the plaintiff is entitled to "up to three, but not less than two, times" actual damages. *Id.* Injunctive relief is available in some circumstances. *Id.*

When chapter 93A was first enacted, it referred to claims brought "in equity." *Nei v. Burley,* 388 Mass. 307, 311–12, 446 N.E.2d 674 (1983). After the legislature struck these two words in 1978, *id.* at 312, 446 N.E.2d 674, the belief among most of the justices of the Massachusetts Superior Court who had to administer its enforcement was that chapter 93A statutorily required trial by jury. Various Superior Court decisions so held. *See, e.g., Charles River Constr. Co. v. Kirksey,* No. 82–4847 (Mass.Super.Ct. Sept. 16, 1983), *aff'd on other grounds,* 20 Mass.App.Ct. 333, 480 N.E.2d 315 (1985), reproduced as an Appendix to *In re Acushnet River & New Bedford Harbor: Proceedings Re Alleged PCB Pollution,* 712 F.Supp. 994, 1008–10 (D.Mass.1989). The First Circuit, likewise, took this view. *Capp Homes v. Duarte,* 617 F.2d 900, 902 n. 2 (1st Cir. 1980). The judges who had ascribed to this view, however, had guessed wrong.

In *Nei v. Burley,* the Massachusetts Supreme Judicial Court ruled that the statute does not provide for trial by jury. 388 Mass. at 311–15, 446 N.E.2d 674. The court has further held that the state constitution does not guarantee trial by jury on the chapter 93A claim. *Id.* The court explained that the state legislature had created a "sui generis" cause of action for unfair or deceptive practices. *Id.* at 314, 446 N.E.2d 674. Analogies to common-law claims for breach of contract, fraud, and deceit were inappropriate because chapter

93A "created new substantive rights in which conduct heretofore lawful under common and statutory law is now unlawful." *Id.* at 313–15, 446 N.E.2d 674.

Then a funny thing happened. Notwithstanding *Nei,* justices of the Superior Court went right on trying chapter 93A cases to a jury whenever related contractual or tort claims deserved such a trial and where it served judicial efficiency. Massachusetts practice allows judges, even in equitable cases, to frame factual issues for a binding jury trial. Mass. R. Civ. P. 39(c). Following this practice, the jury trial of chapter 93A cases became routine and continues to this day. *E.g., Dalis v. Buyer Adver., Inc.,* 418 Mass. 220, 225 n. 7, 636 N.E.2d 212 (1994); *Travis v. Mc-Donald,* 397 Mass. 230, 233–34, 490 N.E.2d 1169 (1986); *Service Publ'ns, Inc. v. Goverman,* 396 Mass. 567, 577–78, 487 N.E.2d 520 (1986) *declined to be followed on other grounds by Commonwealth v. Johnson Insulation,* 425 Mass. 650, 667 n. 17, 682 N.E.2d 1323 (1997); *Madan v. Royal Indem. Co.,* 26 Mass.App.Ct. 756, 757 n. 2, 532 N.E.2d 1214 (1989); *Acushnet Fed. Credit Union v. Roderick,* 26 Mass.App.Ct. 604, 606, 530 N.E.2d 1243 (1988); *Charles River Constr. Co., Inc.,* 20 Mass.App.Ct. at 337–39, 480 N.E.2d 315; *Newly Weds Foods, Inc. v. Westvaco Corp.,* No. 99–5194–C, 2001 WL 1586691, at *1 (Mass.Super. Dec. 12, 2001) (Lauriat, J.); *Linkage Corp. v. Trustees of Boston Univ.,* No. 914660B, 1995 WL 809556, at *1 (Mass.Super.Ct. Mar. 28, 1995) (Volterra, J.). This practice of submitting chapter 93A cases to the jury has resulted in the rigorous development of chapter 93A jurisprudence because jury fact-finding necessarily requires the most precise explication of the law.[1] The need to educate juries has brought into being Justice Kass' great aphorism that chapter 93A requires proof of conduct "that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce," *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 504, 396 N.E.2d 149 (1979), and later caused the Supreme Judicial Court to disavow that formulation, *Massachusetts Employers Ins. Exch. v. Propac–Mass, Inc.,* 420 Mass. 39, 42–43, 648 N.E.2d 435 (1995), in perhaps the vain search for even more precision. It is safe to say that the involvement of the jury has made chapter 93A the robust and discerning remedy it is today in the courts of the Commonwealth.

■ The right to trial by jury under the Seventh Amendment is, however, matter of federal law. *Simler,* 372 U.S. at 222, 83 S.Ct. 609; *see also Gallagher,* 962 F.2d at 122 ("The touchstone of our inquiry is the Seventh Amendment, which, while it does not apply to state court proceedings, nonetheless controls when a federal court is enlisted to adjudicate a claim brought pursuant to a state's substantive law."). Consequently, this Court must look not to *Nei* and its progeny, but to federal court precedent in determining whether MEEI has a right to trial by jury on the chapter 93A claim.

■ The First Circuit has never squarely decided the question. Its most extensive discussion of the issue is found in *Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049 (1st Cir.1985). In that case, the parties stipu-

---

**1.** It is the enduring union of judge and jury in the process of fact finding that has made the American trial system the envy of the world and has conferred upon its judiciary the moral authority that has given birth to trial-level constitutional interpretation—a jurisprudence unique in world history. *See* William G. Young, The American Jury: Guarantor of Judicial Independence, Address to the Florida State Bar, June 28, 2007 (copy on file in chambers).

lated, on the basis of *Nei*, that there was no right to trial by jury on a chapter 93A claim. *Id.* at 1064. The parties tried two legal claims to a jury. After the jury returned its verdict, the trial judge stated on the record that he considered the same evidence that the jury considered and did not agree with the conclusions that the jury had reached. Although he did not disturb the jury verdict, he ruled on the chapter 93A claim in a manner that was inconsistent with the jury verdict. *Id.* at 1052–53, 1063–64.

On appeal, the parties presented to the First Circuit the question whether the jury verdict on the legal claims bound the determination of the chapter 93A claim. *Id.* at 1064. The court observed that Supreme Court precedent does not permit a judge to "depriv[e] a party of its constitutional right to a jury trial by ruling on the equitable claims first with the result that the legal claims become barred by the operation of collateral estoppel principles." *Id.* at 1066 (discussing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). The court ruled that the trial judge had not violated the strictures of *Beacon Theatres, Inc.* because he had deferred ruling on the chapter 93A claim until after the jury had returned its verdict. *Id.* at 1066.

In reaching its conclusion, the First Circuit observed that the parties had stipulated that there was no right to trial by jury. *Id.* at 1064. The court continued, "Although the *Nei* court did not explicitly address the seventh amendment requirement, we believe that the reasoning employed by the Massachusetts Supreme Judicial Court in *Nei* is determinative of the seventh amendment issue." *Id.* QLT contends that this language squarely holds that there is no Seventh Amendment right to trial by jury on a chapter 93A claim. The First Circuit did not, however, address that Seventh Amendment issue in *Wallace Motor.* Rather, it addressed a different issue—whether a jury determination of legal claims controlled the outcome of a concededly equitable claim. *Nei* has nothing to do with this issue of federal law. It was relevant in *Wallace Motor* only to the extent that it persuaded the parties to stipulate that the chapter 93A claim was an equitable claim, thus depriving the First Circuit of any case or controversy as to the actual nature of a chapter 93A claim in federal court.[2]

---

**2.** The First Circuit has repeatedly addressed precisely the same issue that it first decided in *Wallace Motor.* Each time, the court affirmed the district court's resolution of the chapter 93A claim following the jury verdict. In so doing, the court cited, without discussion, either *Wallace Motor* or *Nei* and its progeny. *Santos v. Sunrise Med., Inc.*, 351 F.3d 587, 590 n. 2 (1st Cir.2003); *Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 153 (1st Cir.2000) (citing *Nei*); *Fredette v. Allied Van Lines, Inc.*, 66 F.3d 369, 375–76 (1st Cir.1995) (citing *Wallace Motor*); *Perdoni Bros., Inc. v. Concrete Sys., Inc.*, 35 F.3d 1, 5 (1st Cir.1994) (citing *Wallace Motor*); *PH Group, Ltd. v. Birch*, 985 F.2d 649, 652 (1st Cir.1993) (citing *Wallace Motor*); *Putnam v. DeRosa*, 963 F.2d 480, 487–88 (1st Cir.1992) (citing *Acushnet Fed. Credit Union*, 26 Mass.App.Ct. at 606, 530 N.E.2d 1243 (citing *Nei*)); *Refuse &*

*Env't Sys., Inc. v. Industrial Servs. of America, Inc.*, 932 F.2d 37, 42, 42 n. 2 (citing *Nei*); *Nickerson v. Matco Tools Corp.*, 813 F.2d 529, 531 (1st Cir.1987) (citing *Nei*); *Turner v. Johnson & Johnson*, 809 F.2d 90, 102 (1st Cir.1986) (citing *Wallace Motor*); *cf. Veranda Beach Club Ltd. P'ship v. Western Sur. Co.*, 936 F.2d 1364, 1386 (1st Cir.1991) (citing *Town of Norwood v. Adams–Russell Co., Inc.*, 401 Mass. 677, 678 n. 3, 519 N.E.2d 253 (1988) (citing *Nei*)); *Olin v. Prudential Ins. Co. of America*, 798 F.2d 1, 7–8 (1st Cir.1986) (citing *Nei*), overruled by *Gallagher*, 962 F.2d 120. In none of these cases did the First Circuit have occasion to determine whether there was a federal right to trial by jury on a chapter 93A claim.

Further, the First Circuit has cast doubt on the continuing vitality of its holding in *Wallace Motor.* In *Troy v. Bay State Computer*

Somewhat incongruously, the First Circuit has explained that it relied on Massachusetts law in reaching its result in *Wallace Motor. PH Group, Ltd.*, 985 F.2d at 652. Since the Seventh Amendment right to trial by jury is matter of federal law and not state law, however, the court's acknowledgment in *PH Group, Ltd.* confirms that *Wallace Motor* did not decide whether there is a Seventh Amendment right to trial by jury on a chapter 93A claim. The Southern District of New York reached this conclusion when confronted with the question of what *Wallace Motor* and its progeny held. That court observed that the First Circuit had "simply cited" to *Nei* and "did not address the issue under the seventh amendment." *In re Friedberg*, 131 B.R. 6, 13 n. 7 (S.D.N.Y.1991). Based on the foregoing authorities, this Court concludes that the First Circuit has never ruled on the nature of chapter 93A claims and whether there is an attendant Seventh Amendment right to a jury. *Cf. Sevinor v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 807 F.2d 16, 18–19 (1st Cir.1986) (declining to determine the equitable nature of chapter 93A claims).

In *Puretest Ice Cream, Inc. v. Kraft, Inc.*, 614 F.Supp. 994 (D.Mass.1985), Judge Skinner squarely addressed the Seventh Amendment right to trial by jury on a chapter 93A claim. *Id.* at 995. Judge Skinner noted that the Supreme Court has analyzed the right to trial by jury in fashion different from the Massachusetts Supreme Judicial Court. *Id.* at 996. He explained that where *Nei* had looked for evidence that chapter 93A claims actually existed at common law, the Seventh Amendment simply requires "historical or analogous connection to claims triable to a jury." *Id.; see also Chauffeurs, Teamsters and Helpers, Local No. 391*, 494 U.S. at 565, 110 S.Ct. 1339 (confirming the nature of this inquiry under the Seventh Amendment); *Tull v. United States*, 481 U.S. 412, 417, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (same).

Turning to chapter 93A, Judge Skinner noted the statute's "unquestionably hybrid standard." *Puretest Ice Cream, Inc.*, 614 F.Supp. at 996. On the one hand, "[t]he 'unfairness' of given acts or practices presents a question of fact traditionally left to the court for decision rather than to a jury." *Id.* On the other hand, allegations of deceptive conduct "closely resembles the common law action of deceit as known in Massachusetts courts." *Id.* at 997.

In view of chapter 93A's "hybrid standard," Judge Skinner gave controlling weight to the remedy sought, observing that the plaintiffs had asked for "actual and punitive damages, which, as the form of relief customarily awarded in pre-merger courts of law, would strongly support finding a right to jury trial, if it were the only mode of relief they seek." *Id.* Judge Skinner ruled that to the extent that plain-

*Group, Inc.*, 141 F.3d 378, 383 (1st Cir.1998), the court noted the general rule that a jury verdict binds the resolution of equitable claims resting on common issues. In a footnote, the court observed that it had "suggested that a different rule might apply" with respect to chapter 93A claims. *Id.* at 383 n. 3. The court noted that "there will rarely be inconsistent findings as between the jury and the judge because of the unique findings required from the judge" in making chapter 93A determinations. *Id.* In *Wallace Motor*, this had been the case; the district judge had

stated explicitly on the record that he considered exactly the same evidence that the jury had considered but had nonetheless drawn different factual conclusions. 780 F.2d at 1062–63. Since the *Troy* court was not squarely faced with the issues presented in *Wallace Motor*, the court said that it would "leave the problem for another day." *Troy*, 141 F.3d at 383 n. 3; *see also Roche v. Royal Bank of Canada*, 109 F.3d 820, 826 n. 6 (1st Cir.1997) ("We need not reach the issue since we affirm the chapter 93A judgment for defendants on other grounds.").

tiffs sought injunctive relief, they were not entitled to trial by jury. *Id.*

Although *Puretest* preceded *Wallace Motor*, the Southern District of New York stated that the reasoning of *Puretest* survived *Wallace Motor* because the First Circuit had not decided whether there was a Seventh Amendment right to trial by jury on a chapter 93A claim. *In re Friedberg,* 131 B.R. at 13 & n. 7. After *Puretest,* two courts have addressed the issue whether there is a Seventh Amendment right to trial by jury on an unfair trade practices claim. In *Friedberg,* the Southern District of New York found *Puretest*'s reasoning persuasive. 131 B.R. at 13 n. 7. In that case, the court held that there was a right to trial by jury under the South Carolina Unfair Trade Practices Act when the plaintiff sought only actual and treble damages. *Id.* at 14. In *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 629 F.Supp. 644, 647 (D.Me.1986), the District of Maine ruled that there was no right to trial by jury under the Maine statute because the statute authorized only injunctive relief.

The trinity of cases considering the right to trial by jury on an unfair trade practices claim is thus in agreement. There is a right to trial by jury when the plaintiff seeks actual and treble damages. *In re Friedberg,* 131 B.R. at 14; *Puretest Ice Cream, Inc.,* 614 F.Supp. at 997. By contrast, there is no right to trial by jury to the extent that the plaintiffs seek injunctive relief. *L.L. Bean, Inc.,* 629 F.Supp. at

647; *Puretest Ice Cream, Inc.,* 614 F.Supp. at 997.

The reasoning of these cases is persuasive. Such a rule is consistent with the First Circuit's statement that an "action for money damages is the 'traditional form of relief offered in courts of law.'" *Gallagher,* 962 F.2d at 123 (citing *Curtis v. Loether,* 415 U.S. 189, 196, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974)). Although the court explained that not every award of monetary damages is necessarily legal relief, *id.,* drawing a line between "unfairness" and "deceptiveness" claims would be unworkable in practice, *see id.* The *Nei* court itself noted that "the line separating what is 'deceptive' from what is 'unfair' is thin indeed, and a claim for 'deceptive practices' might entail the same kinds of determinations which are inherent in claims of 'unfair practices.'" 388 Mass. at 313, 446 N.E.2d 674. The most manageable way to sort out chapter 93A claims is to look to the nature of the remedy sought. This rule is in keeping with the First Circuit's observation that chapter 93A provides for both legal and equitable remedies. *Gerli v. G.K. Hall & Co.,* 851 F.2d 452, 454 (1st Cir.1988). Since MEEI seeks only actual and treble damages, this Court holds that MEEI has a Seventh Amendment right to trial by jury on its chapter 93A claim.[3]

The Seventh Amendment requires a serious commitment to trial by jury. "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm

**3.** This result—that the Seventh Amendment requires trial of chapter 93A claims by jury in federal courts where actual and punitive damages are sought—has no effect on Massachusetts practice, of course, since the Seventh Amendment does not apply to the states via the Due Process Clause of the Fourteenth Amendment. *Gallagher,* 962 F.2d at 122. While it is generally believed that the Declaration of Rights of the Massachusetts Constitu-

tion grants the citizens of the Commonwealth greater liberties than the United States Constitution, *see generally, e.g.,* Herbert P. Wilkins, *Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution,* 14 Suffolk U.L.Rev. 887 (1980), here it is the Seventh Amendment contained in the Bill of Rights that is more protective of individual liberties.

a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Gallagher*, 962 F.2d at 122 (quoting *Chauffeurs, Teamsters and Helpers, Local No. 391*, 494 U.S. at 565, 110 S.Ct. 1339). As this Court has observed, "[o]ur juries are the ultimate realization of our people working together, under law, to do justice. De Tocqueville recognized with masterful clarity that, in our jury system, Americans had embarked on a stunning experiment in direct popular rule." *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 271 n. 3 (D.Mass.1998). The right to trial by jury is not a mere formality in civil cases. Rather, it is direct democracy at work.

It is, in fact, the most vital expression of direct democracy in America. Today, it is the New England town meeting writ large, the people themselves governing. In fact, the very processes of our judicial system themselves vindicate and strengthen democracy by involving litigants with standing in the application of our laws. . . .

When people recognize that they have been cut off from their opportunity to govern directly through citizen juries, the sense of government as community, as a shared commonwealth, is severely diminished. Jury service is the citizen's only direct experience of government at the federal level. Severing that shared bond, of course, leaves citizens with their right to vote, but, inevitably, as the government draws away from its citizenry, that right seems less valuable. It is not too much to say that, as our government is the ultimate teacher, its devaluation of direct citizen participation carries

the implicit message that communitarian efforts are simply not worth very much in an age of individual self seeking.

*Id.* (citations omitted).

If ever there was doubt about the capacity of juries to understand and resolve complex cases, a review of the transcript here ought settle the matter. This case was exceedingly complex. It tried over three weeks. The trial transcript ran 1,847 pages. There were 330 exhibits, not the least of which included labyrinthian scientific papers and patents concerning a medical procedure that required learning a technical vocabulary to understand.

Despite the daunting nature of the task that lay before it, the jury came through masterfully. By the end of the three weeks, the jury had seized control of the trial, requesting documents and asking penetrating questions that cut to the core issues.[4] The attorneys often took their cue from the jury, following up on the jury's questions and requests for exhibits, including demonstrative exhibits clarifying the complex relationships between the various people and institutions mentioned in the case.

Nor is this jury's thoughtful consideration of the evidence an aberration. Juries, which are drawn from a representative sample of Americans, have shown time and again that they have the capacity to grapple with and pass judgment on a dizzying array of issues that face us as a society. Jurors rely on a vast reservoir of common sense based on everyday experiences and morals. This case saw a representative sample of Americans at their best. It could not be otherwise because

---

4. To empower the jury, this Court allows juries to take notes and ask written questions. *See, e.g.,* Gregory E. Mize & Christopher J. Connelly, *Jury Trial Innovations: Charting a Rising Tide,* Court Review (Spring 2004), *available at* http://aja.ncsc.dni.us/courtrv/cr-41-1/CR41-1Mize.pdf (last visited July 5, 2007). In this case, the jurors posed 33 questions.

the jury's judgment directly reflects our society's capacity for reasoned consideration of evidence.

## B. Standard for Review

This case was submitted to the jury on both the unjust enrichment and chapter 93A claims. The First Circuit stated that here the success of the chapter 93A claim was "not necessarily dependent" on the success of the unjust enrichment claim. *MEEI I*, 412 F.3d at 243. On remand, however, MEEI failed to demonstrate any other basis for a chapter 93A violation. This Court therefore held that the chapter 93A claim depended on the unjust enrichment claim. Accordingly, the Court instructed the jury to consider the unjust enrichment claim first. If, and only if, the jury found unjust enrichment could it proceed to the chapter 93A claim. The jury's finding of a chapter 93A violation therefore subsumes a finding of unjust enrichment.

 Under well-established Supreme Court precedent, the jury determination of legal claims resolves equitable claims to the extent that the claims factually overlap. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). Consequently, the jury's chapter 93A determination controls the unjust enrichment claim. The Court must therefore defer to the jury's factual findings with respect to both claims.

There is an added wrinkle. As described, unjust enrichment is available only when there is no adequate remedy at law. Since MEEI has prevailed on the chapter 93A claim, which provides a full remedy at law, the unjust enrichment claim is duplicative. *See, e.g., In re Lupron Marketing,* 295 F.Supp.2d at 182. Having ruled that the jury is the factfinder with respect to the chapter 93A claim, nothing logically remains but to enter judgment on that claim in accordance with the jury's verdict and dismiss the unjust enrichment claim as duplicative— unless there is merit to some other aspect of QLT's motion for judgment notwithstanding the verdict. There is no such merit.

Nonetheless, the best way conclusively to demonstrate that the jury got it right is to rehearse the facts as they would independently have been found by the Court had it been the fact-finder. As will be seen, this independent fact-finding is, save in one respect, fully consistent with the jury's verdict.[5]

---

5. This, of course, is not the traditional way to go about considering whether a jury verdict must stand. Courts accord considerable deference to jury verdicts. *See, e.g., Rivera Castillo v. Autokirey, Inc.,* 379 F.3d 4, 9 (1st Cir.2004).

Here, however, the Court independently found the facts and presents them at this point in the opinion. I ought explain why.

First, in truth I commenced the trial under a misapprehension. I thought (correctly) that the unjust enrichment claim was equitable in nature and (wrongly) that I would have to make findings under Fed.R.Civ.P. 52(b) regardless of how the jury found with respect to the chapter 93A claim. This was error because, as the trial developed, it became clear that MEEI had nothing but the unjust enrichment claim upon which to ground its claimed

chapter 93A violation. Thus, as explained above, the jury's finding of the chapter 93A violation is conclusive of the unjust enrichment claim. As it turns out, there is really nothing left for me to do.

Second, while I have tried chapter 93A cases to a jury ever since my days on the Massachusetts Superior Court, QLT's vigorous opposition to submitting to the judgment of the people came as a first in my experience. "What if they're right?" I thought. In that case, the verdict of the jury would be advisory only, and the Court's findings would be required. Prudence required, therefore, a careful, independent, and contemporary analysis of the evidence.

Third, while trial judges are the jury's strongest partisans and with near unanimity

## C. The Court's Findings of Fact

### 1. The Development of Visudyne

The story of Visudyne begins in the late 1970s. Dr. Julia Levy, an immunologist at the University of British Columbia, and her husband Ed Levy,[6] had a cottage on a remote island north of Vancouver. Tr. at 1561:24–1562:5; 1584:20–22. Their children would play in a field of cow parsley outside the cabin. Dr. Levy noticed that sometimes after play, the children would develop lesions on their legs and torsos that looked like scalds. She did not know what it was. When the Levys returned to Vancouver, she called a friend who was the head of the botany department at the University of British Columbia. Her friend explained that cow parsley contains a photosensitizer chemical that was activated by light and that the children had likely gotten burned after they got sap on their skin and sunlight activated the chemical. Tr. at 1584:22–1585:18.

Dr. Levy's friend then told her about photodynamic therapy, which uses light-activated drugs in medical treatment. Tr. at 1585:19–21. Photodynamic therapy works by shining light on a chemical called a photosensitizer. When light is shined on the photosensitizer, the chemical becomes energized. In this energized state, the photosensitizer is toxic. When the photosensitizer is targeted, it will kill only unwanted cells. Tr. at 1278:14–25; 1304:22–1305:3.

Dr. Levy became very interested in incorporating photodynamic therapy into her work on cancer immunology. Tr. at 1585:19–25. Working in a lab at the University of British Columbia, Dr. Levy helped develop a photosensitizer called benzoporphyrin derivative monoacid ("BPD") that had a unique ability to deliver itself to new blood vessels immediately following injection. Tr. at 1567:5–23; 1573:20–1574:14. BPD can also absorb light at a wavelength that penetrates animal tissue. Tr. at 1579:15–19. The lab developed a liposomal formulation that allowed the endothelial cells in blood vessels to absorb BPD. Tr. at 1573:6–19; 1597:7–14; 1599:18–1600:2. The lab developed the drug for cancer treatment as part of a partnership at the time with American Cyanamid. Tr. at 1569:1–8; 1594:2–17; Ex. 303, at Q06642–44.

This work took place in the 1980s and early 1990s. The work on BPD resulted in drug composition patents owned by the University of British Columbia. Tr. at 1574:22–1575:5; 1581:13–21. By then, Dr. Levy had co-founded a biotechnology company called QLT. Tr. at 1560:6–8; 1563:14–1564:16. The University of British Columbia granted QLT the exclusive rights to BPD in exchange for a royalty rate of 2% on net sales. Ex. 14 at 7; Tr. at 1581:13–21.

In 1988, Dr. Levy spoke about BPD at a conference in Boston. Tr. at 1285:11–19. At the conference, she met Dr. Tayyaba Hasan, a Harvard Medical School professor and biochemist at Wellman Laboratories at Massachusetts General Hospital ("MGH"). Tr. at 1270:25–1271:2; 1332:6–8; 1586:17–1587:1. Dr. Hasan was also doing work in photodynamic therapy. Tr. at 1272:9–11. Given their shared profes-

---

say they agree with jury verdicts, many scholarly analysts discount such views, concluding that it is always easy to agree with the jury *after* the jury has returned its verdict. While unorthodox, it is instructive, therefore, to present the Court's own independent findings derived from its contemporaneous notes. These findings demonstrate—emphatically—the American jury's capacity and wisdom.

**6.** Both Julia Levy and Ed Levy hold doctorates. To distinguish between the Drs. Levy, this Court will refer to Julia Levy as "Dr. Levy" and Ed Levy as simply "Ed Levy."

sional interests, Dr. Levy and Dr. Hasan struck up a good relationship. Tr. at 1332:3–5; 1336:11–1338:18; 1378:13–1379:2. Dr. Levy told Dr. Hasan about BPD and QLT sponsored Dr. Hasan's work using BPD for rheumatoid arthritis and skin cancer. Tr. at 1332:9–1333:6; 1664:24–1665:5; Ex. 303, at Q06644–46.

Around the same time, Dr. Hasan began collaborating with Dr. Reginald Birngruber, a physicist specializing in ophthalmic laser applications who was a visiting professor at the Wellman Laboratories. Tr. at 1285:20–1286:18; 1386:13–1387:13. Their research interests overlapped because Dr. Birngruber's laser expertise complemented Dr. Hasan's focus on photodynamic therapy. Tr. at 1303:4–8. Dr. Hasan had done work using photodynamic therapy to close blood vessels in chick embryos. Tr. at 1284:24–25; 1285:23–1286:1. Dr. Hasan and Dr. Birngruber decided to see if they could extend this work to blood vessels in the eye. Tr. at 1302:4–23; 1304:19–21; 1305:5.

In 1990, Dr. Hasan and Dr. Birngruber hired Dr. Ursula Schmidt–Erfurth, a German ophthalmologist, as a fellow to perform the actual experiments. Tr. at 1286:4–18; 1387:19–1388:4. Over the next two years, they designed and carried out experiments in rabbits using various drug compounds, including BPD, to see if photodynamic therapy could be used to close blood vessels in the eye. Tr. at 1302:4–23; 1304:19–21; 1305:5. The experiments showed that BPD worked well in closing blood vessels in rabbit eyes. Tr. at 1305:16–19.

Dr. Schmidt–Erfurth wanted to apply this work to intraocular tumors, which have unwanted blood vessels. Tr. at 280:18–283:16; 315:2–5. In June 1991, she applied for a fellowship with Dr. Evangelos Gragoudas, a Harvard Medical School professor who was doing work on intraocular tumors at MEEI. Tr. at 237:16–18; 239:12–15; 280:18–281:4; Ex. 227. Dr. Gragoudas did not know about BPD but agreed to supervise her work, which resulted in the publication of a paper on the use of BPD to treat intraocular tumors. Tr. at 257:25–258:7; 283:17–284:4. In addition to this work that Dr. Schmidt–Erfurth conceived, Dr. Gragoudas asked Dr. Schmidt–Erfurth to see if BPD could be used to close normal choroidal vessels in rabbit eyes without damaging the retina. Tr. at 286:2–22; 420:1–14. This research was successful and resulted in the publication of another paper after Dr. Schmidt–Erfurth had completed her fellowship in June 1992 and returned to Germany. Tr. at 287:21–24; 460:19–20; 1306:7–10.

In October 1991, while Dr. Schmidt–Erfurth was still a fellow, Dr. Gragoudas hired Dr. Joan Miller, a former MEEI fellow who had done photodynamic therapy work in monkeys treating abnormal blood vessels in the choroid of the eye. Tr. at 252:13–253:10; 433:23–434:21; 437:15–438:9. Dr. Gragoudas and Dr. Miller decided to use monkeys to see if BPD could be used to treat age-related macular degeneration, a disease that can feature abnormal vessels in the choroid. Tr. at 193:1–8; 274:6–12; 346:24–25; Ex. 231. Dr. Hasan played a role in reviewing the experimental plans and suggesting testing parameters. Tr. at 1311:6–10; 1313:5–6; Ex. 310.

All of the work that Dr. Schmidt–Erfurth had done was in rabbits. Both rabbit eyes and primate eyes have retinas. Rabbit eyes, however, lack retinal vessels. Tr. at 187:4–20; 292:14–24. Unwanted blood vessels in the retina can blur vision. At the time, it was thought that the way to prove that photodynamic therapy could be used to treat age-related macular degeneration was to show that photodynamic therapy could close abnormal retinal vessels

without damaging underlying normal retinal vessels. This demonstration was important because closing normal vessels results in the loss of vision. Because rabbit eyes lack retinal vessels, Dr. Schmidt–Erfurth's work did not predict whether BPD could successfully treat age-related macular degeneration. Tr. at 206:19–207:12; 274:13–17; 291:9–17; 293:1–11; 1374:5–1376:3; Ex. 315, at MGH00186. Previous experiments with other photodynamic dyes to treat age-related macular degeneration had not been successful. Tr. at 257:16–24.

Still, Dr. Schmidt–Erfurth's work in rabbits provided Dr. Miller with treatment parameters to use as a starting point in her first experiments in the spring of 1992. Tr. at 441:8–9; 452:19–25; 457:9–15. For those experiments, Dr. Miller obtained BPD from Dr. Hasan, who had by then become QLT's contact in Boston. Tr. at 444:1–12. To get the BPD, Dr. Miller signed a material transfer agreement with QLT in February 1992. Tr. at 444:13–17; 596:10–14; Ex. 8. Dr. Miller wanted to use the liposomal-complexed BPD that Dr. Hasan was using in clinical trials, but Dr. Miller could obtain only LDL-complexed BPD that Dr. Hasan prepared for her. Tr. at 462:16–463:19; 1310:6; 1311:8–9; 1313:5–6. QLT did not provide any funding. Tr. at 1603:18–20.

The spring 1992 experiments showed that BPD had promise as a photodynamic dye that could close abnormal vessels without damaging the normal retinal vessels in monkeys. Tr. at 274:9–12; 458:17–23. Dr. Miller shared the research results with QLT in September 1992 in a meeting that Dr. Hasan helped arranged. Tr. 459:12–15; 781:21–782:12; 1097:15–1098:2; 1108:11–14; 1317:22–1318:3; 1336:16–18; 1600:4–1601:5; 1667:7–19; Ex. 9, at Q14495–96. Dr. Miller met Dr. Levy for the first time and showed her MEEI's facilities. Tr. at 609:7–21; 781:21–24. Dr.

Miller subsequently asked for liposomal BPD but QLT provided only more LDL-complexed BPD. QLT also did not commit any funding. Tr. at 463:20–25; 632:24–633:6; 782:8–12; 806:17–807:9; 1604:20–1605:10.

With the additional BPD, Dr. Miller carried out additional experiments using higher irradiances than Dr. Schmidt–Erfurth had used in the rabbit studies. Tr. at 465:8–15. Dr. Schmidt–Erfurth had used an irradiance of 150 mW/cm$^2$ but Dr. Miller found it difficult to keep the laser focused for the length of time necessary to administer the treatment. Tr. at 457:9–15; 461:18–24; 475:14–476:3. Studies using BPD to treat skin cancer had suggested that using higher irradiances would damage normal tissue. 478:15–20; 484:14–17. Nonetheless, Dr. Miller wanted to investigate whether it was safe to use a higher irradiance that could result in a shorter treatment time. Tr. at 461:25–462:2; 476:2–7. Dr. Miller worked with Dr. Gragoudas in designing the new set of monkey experiments using irradiance levels of 300, 600, 1200, and 1800 mW/cm$^2$. Tr. at 467:7–8; 477:23–478:1. From these experiments, Dr. Miller learned that higher irradiances could be used without damaging normal tissue. Tr. at 467:22–468:2; 478:25–479:4. Dr. Miller also experimented with treatment parameters such as the dosage of BPD and length of light exposure. Tr. at 479:21–480:3.

Dr. Miller communicated the experimental results to QLT in a conference call in March 1993. Tr. at 480:4–18; Ex. 267. Dr. Levy, who was in on the conference call, expressed surprise that Dr. Miller had gone so high with the irradiance at a particular drug dose and concluded that the eye must be different than the skin. Tr. at 484:14–17; 754:13–755:8 792:14–18; Ex. 267. Toward the end of the conference call, a person at QLT observed that Dr.

Miller's work indicated that age-related macular degeneration was the disease to treat with BPD. Tr. at 484:20–25; 792:25–793:7; Ex. 267.

Later that spring, QLT signed a preclinical agreement with Dr. Miller that committed funding for the first time, though it did not provide salary support for either Dr. Gragoudas or Dr. Miller. Tr. at 480:4–18; 494:18–22; Ex. 236. In May and June 1993, QLT and Dr. Miller signed a confidential disclosure agreement and a material transfer agreement providing Dr. Miller with more BPD. Exs. 235, 243. The following year, in June 1994, the parties signed another material transfer agreement. Ex. 25.

Dr. Miller performed the funded experiments from July 1993 to the end of 1994, after some input from Dr. Levy about experimental design. Tr. at 495:6–7; 1609:16–1613:17; Exs. 44, 236. In these experiments, Dr. Miller was permitted, for the first time, to use the liposomal-complexed BPD that could be used in clinical trials. Tr. at 463:14–19; 596:15–23; 608:8–609:1. Dr. Miller tested treating parameters such as drug dosage and length of light exposure. Tr. at 495:17–18. In late 1994, Dr. Miller sent QLT a preclinical report summarizing the results. Tr. at 495:22–25. This preclinical report was subsequently sent to the Food and Drug Administration ("FDA") to initiate clinical trials in humans. Tr. at 496:5–11.

Clinical trials in humans began in 1995 with Dr. Miller as the principal investigator. Tr. at 503:16–20; Ex. 244. Dr. Miller drafted a clinical protocol that other scientists reviewed, including Dr. Birngruber, Dr. Schmidt–Erfurth, and Dr. Gragoudas. Tr. at 674:23–675:15. Dr. Miller also worked with Dr. Gragoudas to teach other clinical investigators how to interpret clinical data. Tr. at 503:16–504:9. The clinical trials were conducted around the world including in Boston, where Dr. Miller administered the first-ever treatment of Visudyne, and in Germany, where Dr. Schmidt–Erfurth was a clinical investigator. Tr. at 680:8–24. QLT reimbursed MEEI for the costs of patient care incurred during the clinical trials. Tr. at 680:1–2.

The clinical trials resulted in FDA approval of BPD to treat age-related macular degeneration. This approval came in 2000. Tr. at 927:23–928:1; 1615:4–5. This treatment has been marketed as Visudyne.

## 2. QLT's Partnership with CIBA Vision

Even when Visudyne was still in the early stages of development, the parties saw possibilities for commercial exploitation almost immediately. QLT commenced a marketing study after learning for the first time about the work that Dr. Miller and Dr. Gragoudas had done on age-related macular degeneration. Tr. at 1669:3–5. QLT was not willing to provide funding immediately but reserved in the material transfer agreements the right of first refusal to license any treatment. Tr. at 444:18–25; 782:5–12; 445:19–21; Ex. 8, at Q17928; Ex. 243. The agreements required Dr. Miller to disclose research results to QLT, which agreed not to share the results with anyone else. Tr. at 444:18–25; Ex. 8, at Q17928; Ex. 243. Dr. Miller and QLT further signed a confidential disclosure agreement. Ex. 235. As late as 1993, however, QLT did not consider the work on eye diseases significant enough to include in its annual report's section on potential uses for BPD. Tr. at 1674:16–1675:22; Ex. 306.

In November 1993, after Dr. Miller's experiments began showing promise, Ed Levy approached CIBA Vision, a Swiss company, about a partnership. Ex. 296. Ed Levy named Dr. Schmidt–Erfurth and

Dr. Miller as the scientists doing the work. *Id.* The following month, Ed Levy followed up with a letter further discussing the market potential of Dr. Miller's work on age-related macular degeneration. Ex. 309. He noted that QLT had provided a grant to Dr. Miller for preclinical work on age-related macular degeneration and that clinical trials could soon follow. *Id.* To entice CIBA Vision, Ed Levy attached confidential information. Tr. at 1105:8–1106:15.

In January 1994, QLT met with CIBA Vision in Switzerland to discuss a partnership for commercializing BPD to treat age-related macular degeneration. Ex. 299. During that meeting, Dr. Schmidt–Erfurth presented on her own work. Tr. at 1142:7–15. QLT further disclosed treatment parameters learned from Dr. Miller's work. Tr. at 1138:24–1142:6; Ex. 299. CIBA Vision learned that Dr. Miller would be disclosing much of her work at an ophthalmology convention in the spring. Tr. at 1140:23–1141:1; 1141:16–19; Ex. 299, at N002954.

CIBA Vision found Dr. Schmidt–Erfurth's presentation persuasive but requested more information about Dr. Miller's work. Tr. at 1110:10–18; 1150:23–1151:5; Ex. 298. QLT promised to share all experimental data, including the results of Dr. Miller's work. Tr. at 1111:12–25. QLT made these promises to CIBA Vision even though it had signed confidentiality agreements with Dr. Miller. QLT decided to ask Dr. Miller to travel to Switzerland and make a presentation directly to CIBA Vision. Tr. at 555:16–20; 1114:25–1116:1. Ed Levy promised Dr. Miller that QLT would enter into a license agreement with MEEI. Tr. at 555:22–23. In a follow up letter dated February 17, 1994, Dr. Miller expressed her desire to have a draft licensing agreement within the next month for MEEI to review. Ex. 239. In a response

letter dated February 23, 1994, Ed Levy confirmed that Dr. Miller would present to CIBA Vision in April 1994. Ed Levy further reassured Dr. Miller that QLT was looking into licensing. Ex. 266. In a conference call the following week, QLT promised MEEI that it would license the treatment from MEEI. Tr. at 533:19–25; Ex. 265, at Q00932.

In April 1994, Dr. Miller presented on her work to CIBA Vision. Tr. at 559:13–14; 576:16–577:7; 579:10–19; 815:5–816:13; 1114:25–1115:8; 1146:19–1147:5. On the way to the meeting, Dr. Miller sat in the back of the car with Dr. Levy and Ed Levy. She expressed her concerns about discussing confidential work without a formal written agreement in place. Tr. at 559:13–22. The Levys promised Dr. Miller that QLT would protect the information that Dr. Miller was about to present to CIBA Vision and that QLT would license the new treatment method from MEEI. The Levys assured Dr. Miller that QLT would treat MEEI fairly. Tr. at 559:18–22; 811:10–16.

Shortly after Dr. Miller's presentation, CIBA Vision expressed a desire to enter into a partnership. In a letter, CIBA Vision stated, "Dr. J. Miller's (Harvard University) presentation has impressed and convinced us that the Photodynamic Therapy will be the treatment of Age-related macular degeneration of the future." Ex. 300. In May 1994, QLT and CIBA Vision entered into a more detailed Letter of Intent for the worldwide development and distribution of BPD. Exs. 12, 307. In recognition of the promises that QLT had made to Dr. Miller, the Letter of Intent provided that QLT and CIBA Vision would "manage the patent portfolio in collaboration with the other party." Ex. 12, § 2.3.5. The same day that QLT and CIBA Vision issued a press release publicizing the joint venture, MEEI issued its own press re-

lease declaring that MEEI researchers "are participating in a joint worldwide project" with QLT and CIBA Vision to treat age-related macular degeneration. Exs. 42, 307.

At this time, Dr. Miller presented at an ophthalmology convention some of the work that she had already disclosed to CIBA Vision. Tr. at 766:4–7; 770:14–771:24; 813:5–814:18; Ex. 269. QLT and CIBA Vision had been aware from the outset that Dr. Miller would make this work public. During the convention, Dr. Miller had the chance to discuss photodynamic therapy with a CIBA Vision representative. Tr. at 773:16–23. After Dr. Miller's presentation at the ophthalmology convention, CIBA Vision pressed QLT for additional details regarding the work at MEEI, telling QLT that it is "essential that Dr. Miller *does* give a demonstration in monkeys" and "essential that Dr. Miller shares *all the information and statistics* with us." Ex. 330.

Subsequently, at QLT's request, Dr. Miller presented additional clinical data from the monkey trials at a meeting for clinical investigators in July 1994. Tr. at 560:2–5; 677:9–19; 777:10–778:1; 1673:16–22. Following the presentation, Dr. Miller sent QLT the slides of the presentation, knowing that QLT would distribute copies of the slides to people who had been present at the meeting, including representatives of CIBA Vision. Tr. at 586:11–587:14; 778:2–779:4. The slides included both information that had been presented at the ophthalmology convention and information that had not yet been disclosed. Tr. at 588:4–590:2. When Dr. Miller expressed concerns about licensing, QLT reassured her that QLT would treat the infirmary fairly and not to worry about compensation. Tr. at 560:5–8.

Subsequently, QLT signed a definitive agreement with CIBA Vision in February

1995. Ex. 277; Ex. 305, at Q06733. Visudyne has received marketing approval in approximately 40 countries around the world with net revenues of approximately $2,200,000,000. Tr. at 975:9–22; 1092:24–1093:2; Ex. 289.

### 3. The Patenting Process and Licensing Negotiations

While QLT was negotiating with CIBA Vision, Dr. Miller publicly disclosed her work for the first time in two abstracts that were submitted to the Association for Research in Vision and Ophthalmology ("ARVO") in December 1992 and published on March 15, 1993. Tr. at 803:3–6; Ex. 43. The publication of the abstract on March 15, 1993 meant that a patent application had to be filed by March 15, 1994, if at all. 35 U.S.C. § 102(b); Exs. 268, 271.

In late February 1994 and early March 1994, MEEI told QLT that it wanted to patent the work that Dr. Miller and Dr. Gragoudas had done. Tr. at 528:25–529:5. QLT scheduled the issue for discussion as part of a conference call. Dr. Levy, Ed Levy, Dr. Hasan, and Dr. Miller all participated in the conference call that followed shortly after the correspondence between Dr. Miller and Ed Levy described above. Tr. at 1458:12–15; Ex. 265.

During the conference call, the first issue of discussion related to Dr. Hasan's work applying BPD to rheumatoid arthritis. When the subject turned to the inventorship issue that MEEI had raised, Dr. Hasan dropped off the call. Tr. at 1495:11–25. QLT suggested the use of its patent attorney, Kate Murashige. Tr. at 1631:3–1632:21; Ex. 238. QLT also indicated that it did not see itself as an inventor on the patent and wanted to license the treatment from MEEI. Tr. at 533:3–7; 559:2–10; Ex. 238. QLT stated that it would discuss licensing down the road. Tr. at 533:19–25; Ex. 265, at Q00932.

A few days after the conference call, QLT memorialized these representations in letters to Dr. Miller and to Carl Finn, MEEI's director of research administration and technology transfer. Tr. at 831:3–22; 908:17–20; Exs. 238, 271. In both letters, QLT noted the possibility that while it did not claim co-inventorship, there might be others who could claim co-inventorship. Exs. 238, 271. Nonetheless, QLT promised MEEI that it would pay MEEI a royalty based on its sole ownership of the patent application. Ex. 293, at Q21824.

Murashige had two weeks to investigate inventorship. At QLT's request, she interviewed Dr. Miller. Tr. at 1411:3–14. Dr. Miller stated that she and Dr. Gragoudas were the sole inventors of the method to use BPD to treat unwanted neovasculature. Dr. Miller also provided documentation of her work and abstracts published by Dr. Hasan, Dr. Birngruber, and Dr. Schmidt–Erfurth. Tr. at 804:16–18; 1453:1–5; Ex. 268. Beyond her communication with Dr. Miller, Murashige did not do anything else to determine inventorship. Tr. at 1412:18–22; 1421:18–1422:3; 1424:23–1425:18.

Murashige drafted a patent application (the " '473 application") describing in claim 1 a "method to treat conditions of the eye characterized by unwanted neovasculature" using BPD. This claim would cover all unwanted neovasculature, including in the iris, cornea, and choroid. Tr. at 744:4–745:10; Ex. 317. The second claim was directed specifically to choroidal neovasculature. Tr. at 745:17–19; Ex. 317. Murashige also wrote more specific claims describing methods where the BPD was complexed with LDL and liposomes. Murashige named as the inventors Dr. Miller, Dr. Gragoudas, and Dr. Lucy Young, a third MEEI researcher who had contributed to a diagnostic method for observing conditions of blood vessels in the eye. Tr. at 1422:5–16; Ex. 317. The patent application was filed on March 14, 1994, just shy of the one-year deadline. Ex. 317.

Soon after the patent application was filed, Dr. Hasan learned that she had not been named an inventor. Dr. Miller and Dr. Hasan began disputing Dr. Hasan's role in the process. Tr. at 546:2–11; 1335:3–19; Ex. 4. In May 1994, David Glass, who handled patent matters on MGH's behalf, wrote to Murashige questioning the inventorship on the '473 patent application. Tr. at 1174:25–1176:14; Ex. 4. Glass requested further investigation of inventorship and the possible addition of Dr. Hasan and other MGH researchers to the patent. Ex. 4. Dr. Miller responded that Dr. Hasan was a "collaborator" who "did not contribute to the novel aspects of this invention." Ex. 260. Dr. Miller further stated that Dr. Birngruber and Dr. Schmidt–Erfurth "were not even remotely involved." Ex. 260.

As Murashige investigated inventorship, Dr. Miller continued to experiment with testing parameters for BPD. In June 1994, Dr. Miller and QLT signed their third material transfer agreement providing Dr. Miller with more BPD. Tr. at 604:20–24; Ex. 25. QLT changed the wording of the document to provide for the grant to QLT of a "worldwide royalty free non-exclusive license." Dr. Miller crossed out the words "royalty free" because QLT had indicated that they would license the treatment method for a royalty. After she crossed out those words, she signed the document. Tr. at 501:25–502:18; Ex. 25. QLT did not complain about Dr. Miller's crossing out the words "royalty free." Tr. at 502:16–18. QLT continued to send BPD to Dr. Miller. Tr. at 528:18–24.

Even as Dr. Miller was performing the experiments, QLT came to believe that the portion of the '473 application dealing with

age-macular degeneration had to be "refocused" in light of disclosures in the prior art. Exs. 272; 319, at Q18563. In a letter to CIBA Vision, Ed Levy stated:

At one point we verbally conveyed to MEEI a more negative view of the prospects and our willingness to continue funding the application. Their response was, roughly, "Send us the file." We chose to soften our position so that we could maintain control of the process, especially in light of (2) below.

(2) In the original application the only inventors are personnel at MEEI (Miller, Gragoudas, and Young). We continue to believe that at least Ursula Schmidt–Erfurth, possibly Julia Levy, and perhaps Reginald Birngruber and Tayyaba Hasan could be inventors. But we think that this discussion should be postponed until there is agreement about what the invention, if any, is.

What all this amounts to is that there will be additional negotiations with Joan and MEEI over these matters, so even though we hold almost all of the cards, we do not want to muddy the waters. For all I know there may be other reasons not to get into a pissing match with Joan (excuse the technical language)— e.g. she made important contributions to the preclinical proof of principle and she could be an extremely valuable clinical investigator—but it seems to me that the patent negotiations alone are a sufficient reason for all of us to proceed carefully with Joan and her colleagues.

Ex. 319, at Q18563. In the course of the memo, Ed Levy noted that the material transfer agreements gave QLT a right to a non-exclusive royalty bearing license to any patent. *Id.* at Q18562.

During the summer, QLT considered the possibility of narrower claims involving liposomal preparations of BPD. Such a limitation might permit Dr. Levy to be added to the patent as an inventor. Murashige rejected this possible limitation after Dr. Levy stated that the liposomal composition was not superior to the LDL-based composition. Ex. 272, at MEEI000018. Murashige subsequently told MEEI that QLT saw claims to liposomal preparations as dependent claims only. Tr. at 1463:13–21; Ex. 272, at MEEI000018.

The inventorship dispute between MGH and MEEI continued into the fall. Murashige decided that a reasonable way to resolve the matter would be to get everyone together and ask them to relate what they had done in connection with the claimed invention. Tr. at 1436:19–25. The parties agreed to meet in December 1994. Tr. at 1437:1–4. Ahead of the meeting, Murashige wrote a letter to MEEI's attorney, Carl Finn. In the letter, she stated that she did not want to be put in the position of making a unilateral decision about inventorship. She explained that any decision about inventorship would be more acceptable if it reflected a consensus. Tr. at 1438:6–13; Ex. 318, at Q00502.

QLT had promised MEEI that QLT would pay a royalty based on MEEI's sole ownership of the patent application. Because MEEI might lose its status as the sole owner of the patent application, MEEI did not want to broaden inventorship. QLT assured MEEI that a fair business arrangement would be made regardless of how inventorship was sorted out. Ex. 293, at Q21824. QLT made these assurances so that MEEI would have no financial incentive to block the broadening of inventorship. Ex. 293, at Q21824. MEEI agreed to cooperate on the basis of these representations.

At the meeting to sort out inventorship, Dr. Miller, Dr. Gragoudas, Dr. Levy, and Dr. Hasan were present in person. Tr. at 847:15–20; 1438:19–1439:9. Dr. Schmidt–

Erfurth participated by telephone. Tr. at 548:4–5. MGH and MEEI were each represented by counsel and research administrators. Tr. at 356:7–24; 846:7–15; 847:19–848:8; 1181:7–10; 1438:19–1439:5. At the meeting, individuals took turns describing their role in the process. Tr. at 547:4–548:9; 848:9–15; 1182:2–6; 1439:16–17. MGH's attorney suggested introducing the limitation of using BPD in a liposomal composition. Tr. at 1441:25–1442:8; Ex. 302, at EJD–3. Although Murashige had rejected this possibility over the summer, she now understood that this limitation could allow the parties to claim treatment methods with respect to a broader range of eye conditions including the growth of unwanted new blood vessels associated with tumors. Tr. at 1441:3–24; Ex. 302, at EJD–2. On the basis of this understanding, Murashige proposed that the parties file a broader patent application rather than argue over who did what. Tr. at 548:11–549:8; 849:18–850:10. The parties understood that were the patent application broadened in this manner, inventorship would properly include Dr. Miller, Dr. Gragoudas, Dr. Levy, Dr. Hasan, and Dr. Schmidt–Erfurth. Tr. at 548:25–549:8; Ex. 302, at EJD–3. The parties further understood that a continuation-in-part based on this invention would be jointly assigned to MEEI, MGH, and QLT. Ex. 302, at EJD–3.

Following the meeting, Dr. Miller showed the Levys around the MEEI laboratory. While showing the Levys around, Dr. Miller renewed her concerns about dropping the first patent application and filing a broader application listing additional inventors. Tr. at 549:16–22. The Levys reassured her that QLT would compensate MEEI regardless of how the patent was drafted. Tr. at 549:25–550:4. Dr. Miller and the Levys did not discuss a specific royalty rate. Tr. at 712:18–22; 717:4–18.

Subsequently, Murashige filed continuations-in-part canceling the '473 application except with respect to the diagnostic method that the parties had agreed was solely the work of MEEI scientists. Ex. 276, at DCH–3; Ex. 302, at EJD–1. Murashige reworked the canceled claims and filed them as part of a broader patent application (the "'591 application") as discussed at the meeting. Tr. at 1184:13–1885:4; 1448:22–1449:1. MEEI went along on the understanding that it would be treated as a sole owner of the method to treat age-macular degeneration in primates described in claims 7 and 14 of the new application. Tr. at 552:25–553:13; 554:16–555:8; 718:3–12; 1448:15–1448:20; Ex. 36; Ex. 321, at MEEI000083.

Clinical trials began in 1995. The clinical trials were conducted pursuant to two clinical trial agreements with QLT and CIBA Vision. Tr. at 605:1–6; 605:25–606:5; Exs. 61, 244. The clinical trial agreements provided for a worldwide license to QLT under any resulting patent solely owned by MEEI or jointly owned by MEEI and QLT. Ex. 61, at FLE–6. QLT provided MEEI with $15,000 in salary support in recognition of Dr. Miller's experimental work and her role in preparing for the clinical trials. Tr. at 672:22–673:7; Ex. 252.

In November 1995, QLT asked Dr. Miller to speak at an investors' meeting in Toronto. As Dr. Levy and Dr. Miller walked to the meeting, Dr. Miller handed Dr. Levy a draft license agreement. Tr. at 561:6–12. Dr. Levy reassured Dr. Miller that QLT wanted to license the new treatment method and that QLT would follow up with MEEI. Tr. at 561:12–16; 562:1–5.

The draft license agreement contained a royalty rate of 5%. Tr. at 713:17–19; Ex. 242, § 4.1(c). This royalty rate reflected discussions Dr. Miller had with Carl Finn

prior to delivering the draft agreement to Dr. Levy. Tr. at 713:23–714:3; 726:24–730:12. The royalty rate was to be on net sales in jurisdictions covered by an MEEI-owned patent. Tr. at 731:24–732:9; Ex. 242, §§ 1.3, 4.1(c). Dr. Miller believed that patents would be prosecuted worldwide. Tr. at 793:12–16.

In December 1995, QLT sent a letter to Carl Finn stating:

> This is to confirm that QLT wishes to enter into a business agreement with the MEEI/MGH regarding the technology which is the subject of the ['591 application]. QLT is now actively prosecuting this [application] in a number of jurisdictions around the world and as a co-assignee will be free to practice this invention independently. QLT does, however, acknowledge the contributions of all co-inventors. Consequently, QLT does intend to negotiate in good faith with the MEEI/MGH and other assignees to come to an agreement on reasonable terms and royalty rates which will be consistent with industry standards under similar circumstances.... It is our intention to begin these negotiations when it is clear patents will be issued and feasibility of the Invention is proven.

Ex. 21. QLT thereafter refused to negotiate for a period of time. Tr. at 1208:1–4.

In mid–1997, the Patent Office allowed the claims of the '591 application, which would issue as the '349 patent. Exs. 38, 322. MEEI requested that negotiations resume. Ex. 38. In a letter dated July 31, 1997, MEEI stated that Dr. Levy's presence on the application "places MEEI in the uncomfortable position of being dependent on the fairness of QLT, despite its directly adverse economic interest, in the negotiation of a license agreement." Id. MEEI reiterated its belief that "the commercially significant, generic subject matter claimed in the ['591] application was developed solely by its researchers." Id. Accordingly, MEEI requested that QLT "make a concrete license proposal immediately and/or file a continuation application to permit correction of the named inventors." Id. In August 1997, Murashige sent a letter to Carl Finn reassuring him that

> QLT has every intention of promptly negotiating a suitable agreement, both with MEEI and MGH. QLT certainly recognizes the important role the primate model had to play in reducing the invention to practice. As you know, no one is taking the position that the role of the primate model was unimportant.

Ex. 274.

In December 1997, representatives from QLT, MGH, MEEI, and CIBA Vision met in Boston to negotiate a license agreement. Tr. at 866:22–867:3; 873:8–17; 874:6–8. QLT negotiated from the position that it didn't really need a license to the patent but wished to recognize the contributions that MGH and MEEI had made to the development of Visudyne. Tr. at 1212:17–23; 1213:7–10; 1637:7–1638:8; Ex. 30. QLT offered MEEI a one-time $200,000 research grant. Tr. at 874:14–876:4. QLT made a similar offer to MGH. Tr. at 1190:8–1191:18. Neither institution accepted this offer.

The following month, in January 1998, QLT offered a royalty to MGH and MEEI of 0.2% of net sales in the jurisdictions covered by patents. Tr. at 1193:4–1194:2; Ex. 275. In return, QLT wanted MEEI to grant an exclusive license and "any know-how or technology relating to the invention disclosed in the '591 [application]." Ex. 275. MGH and MEEI made no immediate response. Tr. at 877:1–10; 1626:10–12.

Up until this point, MGH negotiated alongside MEEI in part because QLT was negotiating from the position that it did

not really need a license and MGH believed that it could not get anywhere without MEEI. Tr. at 1211:19–1212:23. In September 1998, MGH decided to negotiate directly with QLT. Dr. Rox Anderson, an MGH scientist who had served on QLT's scientific advisory board, wrote in an internal e-mail that MEEI was taking an "unrealistic stance" in licensing negotiations, whereas "QLT has been straight with us all along." Tr. at 1210:17–1211:8; Ex. 30. Dr. Anderson further stated that MGH's negotiating position would "never be stronger." Ex. 30. MGH subsequently made an offer to QLT that included a 0.5% royalty rate. Tr. at 1199:14–18.

In October 1998, MEEI made a separate proposal to QLT. Under the terms of the proposal, MEEI would give QLT an exclusive right with the right to sublicense all of MEEI's patent rights in exchange for a $2,000,000 upfront payment and a minimum 3% royalty on net sales of any product intended for treatment of unwanted neovasculature of the eye using BPD. Ex. 255.

MEEI learned that MGH had proposed to QLT a royalty rate of 0.5%. MEEI acknowledged to MGH that such rate "may be reasonable" assuming that QLT's co-inventorship status was correct. Ex. 256. MEEI explained that the "significantly larger financial terms" MEEI proposed were based upon the assumption that QLT should not be a co-owner. MEEI then proposed to MGH that, "in the interests of rapidly reaching an amicable agreement," MEEI and MGH split the 3% royalty that MEEI had proposed to QLT. Ex. 256.

MGH did not go along with MEEI's proposal. QLT accepted MGH's terms. QLT and MGH executed a license agreement in December 1998. Ex. 40. Under the MGH license, the royalty rate of 0.5% is applied to sales only in the United States and Canada because those are the only countries in which MGH has issued or pending patents. Tr. at 1628:16–1629:5; Ex. 40, § 5.1(a). MGH and QLT further negotiated a side letter adding a "most favored nations" clause. *See* Ex. 57. In this side letter, QLT agreed that in the event that QLT agreed to license MEEI's rights in the jointly owned patent for payment of royalties and other compensation to MEEI on terms less favorable to QLT than the terms of the MGH license, QLT would renegotiate the MGH license to provide MGH the same royalty rate paid to MEEI. *Id.;* Tr. at 1200:3–1201:1; 1202:6–12; 1216:1–18; 1630:4–17.

MEEI and QLT met again in March 1999. Following the meeting, QLT offered a 0.5% royalty with an upfront sum of $500,000 creditable against future royalties. Ex. 324. MEEI did not accept this offer. The instant lawsuit followed shortly thereafter.

### D. Unjust Enrichment

The First Circuit ruled that MEEI could proceed under two theories of unjust enrichment, one growing out of the disclosure of confidential information to CIBA Vision, and the other stemming from the dropping of the '473 patent application in favor of a broader patent. On remand, MEEI vigorously pursued both theories. The merits are addressed in order.

### 1. Disclosure of Confidential Information

The First Circuit held that MEEI's unjust enrichment claim survived summary judgment based on allegations of QLT's misuse of confidential information. *MEEI I,* 412 F.3d at 238. The court explained that under Massachusetts law, "[a] constructive trust ... is imposed to avoid the unjust enrichment of one party at the expense of the other where 'infor-

mation confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information.'" *Id.* (quoting *Mass Cash Register, Inc. v. Comtrex Sys. Corp.,* 901 F.Supp. 404, 423 (D.Mass.1995) (quoting *John Alden Transp. Co., Inc. v. Arnold Bloom,* 11 Mass.App.Ct. 920, 920, 415 N.E.2d 250 (1981) (citing *Barry v. Covich,* 332 Mass. 338, 342, 124 N.E.2d 921 (1955)))).

The First Circuit noted that the same facts underlying this theory of unjust enrichment also formed the basis of MEEI's claim of misappropriation of trade secrets. This Court directed a verdict for QLT on the trade secret claim on the ground that MEEI had failed to prove that QLT used MEEI's trade secrets to forge an alliance with CIBA Vision. Tr. at 1700:22–1701:1. This Court further held that MEEI had failed to demonstrate that any trade secrets were used in the actual treatment under Visudyne from which profits are derived. Tr. at 1701:2–6. Finally, this Court ruled that there were no damages because, to the extent there were any trade secrets, Dr. Miller disclosed them at the ophthalmology convention long before the commercialization of the treatment. Tr. at 1700:17–21.

QLT argued that the expiration of MEEI's trade secrets claim spelled an end to any theory of unjust enrichment growing out of the same set of facts. The First Circuit held, however, that MEEI "should have the opportunity to prove the distinct elements of its unjust enrichment and trade secret claims." *MEEI I,* 412 F.3d at 238 n. 13. The misappropriation of trade secrets claim, which sounds in tort, required MEEI to show that it had taken steps to keep secret confidential information and that QLT had breached its duty not to disclose that information. *See, e.g., Jet Spray Cooler, Inc. v. Crampton,* 377

Mass. 159, 165, 385 N.E.2d 1349 (1979). By contrast, unjust enrichment requires MEEI to show only that QLT used MEEI's confidential information at MEEI's expense. *MEEI I,* 412 F.3d at 238. This confidential information does not need to be a trade secret for the unjust enrichment claim to succeed.

QLT contends that there can be no unjust enrichment because the material transfer agreements gave QLT a right of access to Dr. Miller's work. These material transfer agreements, however, did not permit QLT to share this information with third parties. QLT could disclose this information to CIBA Vision only with Dr. Miller's permission. Thus, while QLT had a right to Dr. Miller's data, it did not have an unrestricted right to use this data as it wished.

QLT nonetheless shared this information with CIBA Vision without Dr. Miller's permission, disclosing in January 1994 treatment parameters learned from Dr. Miller's work. When CIBA Vision expressed interest in a partnership but first wanted to learn more about Dr. Miller's work, QLT promised that it would share all experimental data. QLT made these promises even though it was aware that it could not disclose this information without Dr. Miller's permission.

When QLT asked Dr. Miller to make a presentation directly to CIBA Vision, Dr. Miller twice expressed concerns about disclosing the results of her work without a licensing agreement in place. Dr. Miller made the presentation after QLT assured her both times that QLT would work out a licensing agreement with MEEI. Dr. Miller's presentation worked a great benefit for QLT. Shortly after the presentation, CIBA Vision agreed to enter into a partnership with QLT, stating that Dr. Miller's work had "impressed and convinced" it

that photodynamic therapy was the way to treat age-related macular degeneration.

Even as CIBA Vision and QLT were negotiating the agreement, CIBA continued to emphasize the need for continued disclosure of Dr. Miller's work. CIBA Vision stated in a letter that it was "essential" that Dr. Miller demonstrated her work in monkeys and shared "all the information and statistics" with CIBA Vision. When QLT asked Dr. Miller to make such a presentation, Dr. Miller again expressed concerns about licensing. QLT again told Dr. Miller that a licensing agreement was forthcoming.

Two clear patterns emerge from this factual recounting. First, CIBA Vision specifically and repeatedly requested access to Dr. Miller's work. CIBA Vision further made clear that it saw access to Dr. Miller's work as an essential component of any agreement with QLT. Second, QLT knew that Dr. Miller was reluctant to share the results of her work without a licensing agreement in place. Because QLT needed Dr. Miller's cooperation in order to please CIBA Vision, QLT assured Dr. Miller that it would license the treatment from MEEI. In this fashion, QLT was aware that there was commercial value to Dr. Miller's work and that it could not be had without paying something for it. QLT made the business decision to promise payment for this information and reaped rich rewards when, as a result of this disclosure, CIBA Vision agreed to form a partnership to develop and market Visudyne, a collaboration that resulted in net sales of over $2,200,000,000 worldwide.

QLT nonetheless protests that Dr. Miller disclosed much of her work at an ophthalmology convention almost immediately after making her first presentation to CIBA Vision. QLT, however, told CIBA Vision almost from the outset that Dr. Miller was going to disclose her work at the convention. Conceivably, CIBA Vision could have waited until the convention to learn the details of Dr. Miller's work without going through QLT. But CIBA Vision wanted the information sooner from QLT, and QLT was willing to make the promises that it made to Dr. Miller in order to get her to make an earlier presentation to CIBA Vision.

Furthermore, even after Dr. Miller made the public disclosures, CIBA Vision continued to press QLT for more details of her work. CIBA Vision, as described, wanted Dr. Miller herself to give a demonstration in monkeys and to share all information and statistics with CIBA Vision. This continued insistence for access to Dr. Miller's work showed that Dr. Miller continued to possess valuable confidential information even after the public disclosures. QLT made further promises to Dr. Miller in order to get her to share her work with CIBA Vision.[7]

QLT obtained this information at MEEI's expense. CIBA Vision's insistent requests for immediate access to Dr. Miller's work put MEEI in a powerful bargaining position to negotiate for a licensing agreement. Dr. Miller presented her work to CIBA Vision only after QLT assured her that MEEI would be fairly compensated. After Dr. Miller disclosed her work to CIBA Vision and QLT entered

---

7. Notably, Dr. Miller's public disclosure of her work did not lessen its commercial value to QLT. Because QLT owns the compositional patent to BPD, no one could exploit Dr. Miller's work without first obtaining permission from QLT to use the drug. This fact is a key reason why MEEI's unjust enrichment claim survived the directed verdict for QLT on the trade secrets claim. Whereas Dr. Miller's public disclosures destroyed the status of any confidential information as trade secrets, her work continued to have commercial value to QLT.

into a partnership with CIBA Vision, MEEI lost much of its bargaining power and was unable to obtain a licensing agreement that reflected the powerful bargaining position that MEEI once had. QLT was unjustly enriched when it disclosed Dr. Miller's confidential information, and it did not compensate MEEI for the detriment to its bargaining position.

## 2. Inventorship Agreement

■ MEEI's second theory of unjust enrichment is that QLT induced MEEI to abandon the '473 application, on which MEEI scientists were the sole inventors listed. In place of the '473 application, the parties filed the '591 application, which listed scientists from QLT, MGH, and MEEI. Because the '591 application would permit QLT to exploit the resulting patent without a license from MEEI, MEEI was understandably reluctant to go along with the proposed change. MEEI agreed to the switch in patent applications after QLT promised MEEI fair compensation for its contribution. The First Circuit accepted this framing of the issues. The court stated that while "the proper inventorship of either the '473 application or the '591 application is ... a non-negotiable question of federal law, the question of which application to prosecute was a choice available to the parties." *MEEI I,* 412 F.3d at 232.

QLT contends that the unjust enrichment claim is preempted by 35 U.S.C. § 262, which reads: "In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." The First Circuit recognized that the preemption issue was "close" because "allowing MEEI's claim to proceed would, to some extent,

impinge upon QLT's rights as a co-inventor." *MEEI I,* 412 F.3d at 235. The court noted, however, that "the statute itself admits of an exception to those rights when there is 'any agreement to the contrary.'" *Id.* The court explained that such an "agreement" does not have to be a written, legally enforceable contract. *Id.* The court remanded the unjust enrichment claim to determine whether there was, in fact, such an agreement.

On remand, QLT vigorously contests the inventorship of the '473 application. QLT's theory of the case is that the '473 application should have included MGH and QLT scientists. As a result, QLT would not have needed to obtain a license from MEEI even if the '473 application had resulted in a patent. Under this theory, MEEI gave up nothing when it abandoned the '473 application. This argument misses the mark. As the First Circuit noted, "a claim seeking restitution for unjust enrichment does not require consideration." *Id.* at 234 n. 7.

The issue for the factfinder on remand is therefore simply whether "QLT induced MEEI to agree to the change in scope of the claims, and then unjustly profited from that change by denying fair compensation." *Id.* at 234. This mandate required MEEI to prove, by a fair preponderance of the evidence, that (1) there was an agreement whereby MEEI would abandon prosecution of the '473 application in exchange for fair compensation; and (2) that QLT's failure to honor this agreement resulted in unjust enrichment.

MEEI presented overwhelming evidence that MEEI agreed to drop prosecution of the '473 application in exchange for fair compensation. When MEEI scientists were the sole listed inventors on the '473 application, QLT had told MEEI that it would pay a royalty based on MEEI's sole ownership of the patent application.

When MGH began disputing inventorship, QLT tried to back away from its promises. QLT, in its own words, "verbally conveyed to MEEI a more negative view of the prospects and [QLT's] willingness to continue funding the application." Ex. 319, at Q18563. When MEEI's response was that it would fund the application itself, QLT, again in its own words, "chose to soften [its] position so that [it] could maintain control of the process." *Id.*

QLT assured MEEI that it would fairly compensate MEEI no matter how inventorship was sorted out. To ensure that MEEI would cooperate fully in the broadening of inventorship, QLT represented to MEEI that MEEI would not suffer any financial harm in the process. To this effect, QLT led MEEI to believe that, no matter how inventorship was sorted out, QLT would compensate MEEI as if MEEI were the sole owner of the patent application.

In this manner, QLT made the business decision to tell MEEI that it would be treated as if it were the sole owner no matter how inventorship turned out. If, as QLT now contends, inventorship on the '473 application was incorrect, QLT may have made a bad business decision. But that does not excuse QLT from paying a royalty rate commensurate with the parties' agreement in exchange for MEEI dropping the '473 application.

QLT's failure to honor this agreement to compensate MEEI resulted in unjust enrichment. MEEI gave up the opportunity to prosecute the '473 application which could have resulted in a patent solely owned by MEEI. Such a solely owned patent, had it issued, would have forced QLT to negotiate a license that allowed MEEI to share in a percentage of net sales of Visudyne. MEEI dropped this application in reliance on QLT's assurances that MEEI would not lose financial-

ly in the process. QLT then added itself to the '591 application and used its position as a co-owner of the resulting patent to practice the patent without paying royalties to MEEI. In this process, MEEI lost a chance at the rights to a portion of the net sales of Visudyne that a solely owned patent would have guaranteed. QLT was unjustly enriched when it persuaded MEEI to switch patent applications and then did not compensate MEEI as had been agreed.

## E. Chapter 93A Claim

■ The First Circuit explained that "the same allegations underlying MEEI's unjust enrichment claim could potentially meet" the requirements of chapter 93A. *MEEI I*, 412 F.3d at 243. As described, these requirements include "(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *Id.* (quoting *PMP Assocs., Inc.*, 366 Mass. at 596, 321 N.E.2d 915).

There is a four-year statute of limitations on chapter 93A claims. Mass. Gen. Laws ch. 260, § 5A. When the jury found that MEEI prevailed on the chapter 93A claim, it necessarily found that the claim was not barred by the statute of limitations. This Court independently so finds. QLT points to the letter that it sent MEEI on December 15, 1995, stating that it would begin licensing negotiations "when it is clear patents will be issued and feasibility of the Invention is proven." Ex. 21. True to its word, QLT began negotiations in 1997, after the Patent Office allowed the claims of the '349 patent. MEEI filed this lawsuit on April 24, 2000, less than four

years after negotiations began in full earnest.

This Court further independently finds a chapter 93A violation. Such a finding is well supported by the evidence. QLT's conduct fell within the penumbra of unjust enrichment, an established common-law concept of unfairness. At trial, MEEI proved the additional elements required to establish a chapter 93A violation.

MEEI had, as described, powerful bargaining positions because Dr. Miller pressed early and often for licensing agreements. Dr. Miller presented her work to CIBA Vision only after QLT promised a royalty-bearing licensing agreement. Subsequently, MEEI agreed to drop prosecution of the '473 application after QLT repeated these promises and assured MEEI that it would not suffer financially from cooperating in a patent application with broadened inventorship. QLT made these promises because it needed Dr. Miller to disclose confidential information to CIBA Vision. Further, QLT did not, in its own words, want to get into a "pissing match" with Dr. Miller. Ex. 319, at Q18563.

QLT held "almost all the cards" because it had induced MEEI into surrendering its bargaining chips. When MEEI presented concrete licensing proposals, QLT assured MEEI that a licensing agreement would be forthcoming. Some years later, when QLT finally agreed to negotiate, it started from the position that it did not need to pay MEEI anything because Dr. Levy had been added to the patent. QLT explained that it would nonetheless negotiate for a licensing agreement because it wished to acknowledge the contributions that MEEI had made. This position was inconsistent with QLT's earlier assurance that it would compensate MEEI as if it were the sole owner of the patent. QLT took this new position after it had obtained MEEI's bar-

gaining chips, forcing MEEI to operate from a weak position. MEEI ultimately recognized the position to which QLT had placed it, stating in a letter to QLT that Dr. Levy's presence on the '349 patent placed MEEI "in the uncomfortable position of being dependent on the fairness of QLT, despite its directly adverse economic interest, in the negotiation of a license agreement." Ex. 38.

QLT offered a one-time $200,000 research grant. QLT made this proposal even though it had repeatedly promised a royalty-bearing licensing agreement. After MEEI rejected the offer, QLT finally offered low royalty rates, terms that were not consistent with QLT's promises of fair compensation. When MEEI continued to resist this treatment, negotiations broke down. In this fashion, QLT employed bait and switch tactics to get what it needed from MEEI without paying anything in return. This strategy, which caused substantial injury to MEEI, was both unfair and unscrupulous.

This Court further finds, as did the jury, that QLT's conduct was neither knowing nor willful. QLT played rough hardball with MEEI and tried to get MEEI to accept a low royalty rate on the basis of a weak bargaining position. Despite these unscrupulous tactics, however, QLT always intended to pay MEEI something for its contributions to the development of Visudyne. After the low offer of a $200,000 royalty rate, QLT offered successively higher royalty rates, up to and including the 0.5% royalty rate that MGH had proposed to QLT. QLT increased its offers in attempt to reach agreement; QLT did not intend for negotiations ultimately to break down. For these reasons, this Court independently finds that QLT's conduct was not knowing or willful.

### F. Damages

#### 1. Royalty Rate and Territorial Scope

 There is, finally, the question of fair compensation. The parties stand miles apart on what fair compensation requires, but agree on one thing. They agree that the measure of damages should be expressed in the form of a royalty rate on net sales of Visudyne. This Court accordingly charged the jury with the task of determining a reasonable royalty rate should it find that QLT had been unjustly enriched at MEEI's expense.

MEEI believes that it is entitled to a 13.5% royalty rate on net sales worldwide. QLT counters that MEEI is entitled to no more than what MGH got: a 0.5% royalty rate on net sales in the United States and Canada. The truth lies somewhere in between these two extremes.

It is first worth noting that MEEI prevailed on two theories of unjust enrichment that give rise to different measures of damages for a chapter 93A violation. The theory of unjust enrichment that is based on disclosure of confidential information gives rise to a worldwide royalty rate. The territorial scope is worldwide because CIBA Vision required, as a condition to a partnership, that QLT share all of Dr. Miller's work with CIBA Vision. The resulting collaboration resulted in the development and marketing of Visudyne. Since the disclosure of Dr. Miller's work was an essential condition to the partnership, MEEI is entitled to a share of the revenues growing out of that partnership.

Since revenues are worldwide, the royalty rate is worldwide in scope. As this theory of unjust enrichment is not based on a patent, such a royalty rate continues past the expiration of the '349 patent.

The theory of unjust enrichment based on the switching of patent applications cannot result in a worldwide royalty rate on the basis of this record. Had the '473 application resulted in a patent, MEEI would have owned the exclusive rights to Visudyne only within the territorial scope of the patent. QLT would have been free to market Visudyne everywhere else, including in Europe. When MEEI agreed to drop the '473 application in favor of the broader '591 application, QLT gained only the right to practice the invention within the territorial scope of the '473 application. Although this territorial scope is the United States, QLT concedes that it would have also had to pay a royalty on net sales in Canada because a patent application is pending in Canada. Therefore, a royalty rate based on the dropping of the '473 application can be only on net sales of Visudyne in the United States and Canada.[8]

Since the jury determined that the royalty rate should be worldwide in scope, it necessarily found that QLT was unjustly enriched to MEEI's detriment when QLT disclosed Dr. Miller's confidential information to CIBA Vision. The jury verdict further rules out the possibility that a royalty rate based on the inventorship agreement was more than high enough to

---

8. It is possible that QLT would not have practiced the invention at all had it not been able to obtain a patent license in the United States. In this hypothetical situation, MEEI would have conferred a worldwide benefit on QLT when it agreed to switch patent applications. Were this the case, MEEI would be entitled to a royalty on worldwide revenues in exchange for agreeing to switch patent applications. *See Federal Trade Comm'n v. Verity Int'l, Ltd.,* 443 F.3d 48, 67 (1st Cir.2006) (explaining that "[t]he appropriate measure for restitution is the benefit unjustly received by the defendants."). At trial, however, MEEI produced no evidence to support such a finding.

offset a smaller territorial scope.[9] This Court independently so finds.

So far in its recounting of factual evidence and conclusions, this Court has agreed fully with the jury verdict. This Court, however, would have awarded a different royalty rate. Whereas the jury awarded MEEI a royalty rate of 3.01%, this Court would have awarded a royalty rate of 3.5% based on the following:

QLT's damages expert opined that MEEI is entitled to no more than 0.5% royalty rate on net sales in the United States and Canada. He based this conclusion on the assumption that MEEI was entitled to a royalty rate only on the basis of its co-ownership of the '349 patent. Since the Court rejects that assumption, it does not give any weight to the opinion of QLT's damages expert.

MEEI's damages expert opined that MEEI was entitled to a 13.5% royalty rate. This figure is based on the opinion that MEEI is entitled to half of QLT's profits. This Court does not agree with that assumption, which was not based on the evidence and therefore could not be presented to the jury in the form of expert opinion. Tr. at 985:12–986:14. This Court notes that while MEEI played an essential role in the development of Visudyne, it did not carry Visudyne on its back.

The benefit that QLT obtained from Dr. Miller's presentations was that QLT was able to share that information sooner with CIBA Vision than it could have otherwise. CIBA Vision was aware that Dr. Miller planned to disclose much of her work. Had QLT and CIBA Vision wished, they could have waited until after she made the

disclosures and then used outside experts to help them understand the implications of her work. CIBA Vision, however, wished to learn about Dr. Miller's work sooner rather than later, and wanted her to be the expert teaching them about her work. Accordingly, the value to QLT of Dr. Miller's presentations to CIBA Vision was not that she disclosed confidential information, but that she disclosed the information herself and did so sooner than she would have otherwise. This is a valuable benefit, but it is not one that entitles MEEI to half of QLT's profits.

Further, Dr. Miller's work was not the only body of work that QLT presented to CIBA Vision. Both Dr. Schmidt–Erfurth and Dr. Miller made presentations to CIBA Vision. Together, they showed that BPD worked in both rabbits and monkeys. The fact that BPD worked in two different animal models persuaded CIBA Vision to enter into a partnership with QLT. There is, again, no occasion to determine whether the contributions of MGH scientists were such that the MGH scientists should have been named as inventors on the '473 application. What this Court concludes, however, is that the experimental data gleaned from MGH's work was, like the data from MEEI's work, commercially valuable to CIBA Vision. Thus while MEEI's work was essential to the partnership, it was not the only such data. Certainly MEEI was not entitled to half of the profits for presenting only part of the preclinical evidence, however significant that evidence was.

Rather, on the basis of this record, this Court concludes that MEEI is entitled not

9. In this case, it appears that net sales in the United States and Canada account for approximately half of worldwide revenues. MEEI might have reason to prefer a royalty rate based on net sales in the United States and Canada if such a royalty rate were more

than twice as high as a royalty rate based on worldwide sales. The jury necessarily found that this was not the case when it determined that the most that MEEI was entitled to was the worldwide royalty rate.

to half of QLT's profits but to approximately one-eighth of the profits. MEEI's damages expert testified that QLT made approximately $600 million in profits on $2,200,000,000 in net revenues worldwide. Converting an approximate one-eighth share of profits into a royalty rate yields approximately 3.5%. It is this figure that the Court would have awarded MEEI.

This Court recognizes, however, that the jury's determination is binding provided that it is supported by the evidence. Although this Court would award a slightly higher royalty rate, this Court holds that the jury's award of a 3.01% royalty rate is supported by the evidence. *See Ahern v. Scholz,* 85 F.3d 774, 780 (1st Cir.1996) ("[T]he district court judge cannot displace a jury's verdict merely because he disagrees with it or would have found otherwise in a bench trial. The mere fact that a contrary verdict may have been equally-or even more easily-supportable furnishes no cognizable ground for granting a new trial.") (internal citations omitted).

Commercial resolution of this case might well have yielded yet a different set of terms, conceivably even terms more precisely reflecting the value of MEEI's work. Nonetheless, because the parties could not reach agreement, the task fell to the jury to determine the fair value of MEEI's contributions. The royalty rate arrived at by this jury is necessarily somewhat arbitrary in its imposition on the parties. But, because the parties could not reach agreement on their own, the jury verdict controls.

### 2. Attorneys' Fees

Having prevailed on its chapter 93A claim, MEEI is entitled to its attorneys' fees. Mass. Gen. Laws, ch. 93A, § 11. MEEI submits an application for more than $36,000,000 in fees and costs. Pursuant to *Linthicum v. Archambault,* 379

Mass. 381, 388–89, 398 N.E.2d 482 (1979), *abrogated on other grounds by Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.,* 418 Mass. 737, 745 n. 7, 640 N.E.2d 1101 (1994), and having carefully considered the "nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney[s], the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases," *id.,* this Court awards attorneys' fees and costs in the aggregate sum of $14,093,855.42.

### 3. Prejudgment Interest

MEEI shall have pre-judgment interest at the Massachusetts statutory rate upon the royalty decreed by the jury as those royalties would have become due and payable, commencing on April 24, 2000 when this action was filed.

## IV. CONCLUSION

The story of Visudyne is one of serendipity that would not have been possible without the contributions of every one of the researchers who entered the picture. Dr. Levy helped discover BPD. Dr. Hasan and Dr. Birngruber thought to apply BPD to the eye. Dr. Schmidt–Erfurth carried out much of the early work. Dr. Gragoudas provided the link to Dr. Miller, who applied Dr. Schmidt–Erfurth's work to age-related macular degeneration. The resulting treatment, Visudyne, should have been a cause for the celebration of the extraordinary contributions that each of these scientists made.

Instead, the parties have squabbled over inventorship, minimizing and even dismissing outright the contributions made by others. This dispute over inventorship is exceptionally unseemly, all the more so

because determining correct inventorship was not necessary to a just determination of the case. This dispute does not befit the advancement of science, which builds on the contributions of all. Unless the parties can repair their relationships in the name of science, the losers may well be those who should have been the biggest winners—those who suffer from eye diseases such as age-related macular degeneration.

Judgment shall enter for MEEI with the award of a 3.01% royalty rate on net sales worldwide of Visudyne, past, present and future.[10] MEEI is entitled to prejudgment interest. Finally, MEEI is awarded attorneys' fees in the amount of $14,093,855.42.

SO ORDERED.

---

10. During trial, MEEI made the judicial admission that it would grant QLT an exclusive license to the '349 patent. Tr. at 1222:11–16. Although this promise was not necessary to the outcome of this case, it constitutes a judicial admission and as such is binding on MEEI.